938 F.2d 919
 60 USLW 2017, 1991-1 Trade Cases 69,460
 In re INSURANCE ANTITRUST LITIGATION.
ACE CHECK CASHING, INC.; Acme Corrugated Box Company, Inc.;
Anastasios Markos, t/a Municipal Exxon; Bay Harbor Park
Homeowner's Association, Inc.; Bensalem Township Authority;
Big D Building Supply Corporation, et al., Private
Plaintiffs, Plaintiffs-Appellants,
and
State of Alabama, et al., Plaintiffs,
v.
AETNA CASUALTY AND SURETY COMPANY; Allstate Insurance
Company; Cigna Corp.; Hartford Fire Insurance
Company, et al., Defendants-Appellees.
STATE OF CALIFORNIA; City of Lafayette; City and County of
San Francisco; County of San Benito, Plaintiffs-Appellants,
and
State of Alabama, et al., Plaintiffs,
v.
AETNA CASUALTY AND SURETY COMPANY; Allstate Insurance
Company; Cigna Corp.; Hartford Fire Insurance
Company, et al., Defendants-Appellees.
STATE OF CALIFORNIA; City of Lafayette; City and County of
San Francisco; County of San Benito, Plaintiffs-Appellants,
v.
INSURANCE SERVICES OFFICE, INC., CNA RE (U.K.) Ltd.;
Continental Reinsurance Corporation; Union-America
Insurance Co.; Edwards & Payne Ltd.; Excess Insurance Co.,
Ltd.; General Reinsurance Corp.; Thomas A. Greene &
Company, Inc.; Kemper Reinsurance London; Lloyd's
Underwriters & Brokers; Mercantile & General Reinsurance
Company of America; North American Reinsurance Corporation;
Oxford Syndicate Mgmt. Ltd.; (sued herein as K.F. Adler &
Others (U.A.)
Ltd.); Prudential Reinsurance; Reinsurance Association of
America; Terra Nova Insurance Co.; Aetna Casualty and
Surety Company; Allstate Insurance Company; Winterthur
Reinsurance Corporation of America; Cigna Corp.; Hartford
Fire Insurance Company, Defendants-Appellees.
STATE OF NEW YORK; Roosevelt Island Operating Authority;
Village of Groton; Village of Lake Success,
Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Aetna Casualty and Surety
Company; Cigna Corp.; Allstate Insurance; et
al., Defendants-Appellees.
COMMONWEALTH OF MASSACHUSETTS; Town of Hanover; Town of
Milford, Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Aetna Casualty and Surety
Company; Cigna Corp.; Allstate Insurance; et
al. Defendants-Appellees.
STATE OF MINNESOTA, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Aetna Casualty and Surety
Company; Cigna Corp.; Allstate Insurance; et
al., Defendants-Appellees.
STATE OF WEST VIRGINIA; City of Clay; County of Hancock;
County of Mineral; County of Wirt, Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Aetna Casualty and Surety
Company; Cigna Corp.; Allstate Insurance; et
al., Defendants-Appellees.
STATE OF WISCONSIN, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Aetna Casualty and Surety
Company; Cigna Corp.; Allstate Insurance; et
al., Defendants-Appellees.
CITY OF MOBILE; State of Alabama; City of Birmingham,
Plaintiffs-Appellants,
v.
AETNA CASUALTY AND SURETY COMPANY; Winterthur Reinsurance
Corporation of America; Cigna Corp.; Hartford
Fire Insurance Company; Allstate
Insurance, Defendants-Appellees.
STATE OF ARIZONA, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF MARYLAND, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF WASHINGTON; County of Cowlitz, Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF NEW JERSEY, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF COLORADO, Plaintiff-Appellant,
v.
WINTERTHUR REINSURANCE CORPORATION OF AMERICA; Aetna
Casualty and Surety Company; Cigna Corp.;
Hartford Fire Insurance Company;
Allstate Insurance,
Defendants-Appellees.
STATE OF OHIO; Township of Jackson; County of Hardin,
Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF CONNECTICUT, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
COMMONWEALTH OF PENNSYLVANIA; County of Schuylkill; City
of Altoona; City of York; Borough of
Chambersburg, Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF ALASKA, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF MONTANA; County of Teton, Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF MICHIGAN, Plaintiff-Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
STATE OF LOUISIANA, Cities of Baton Rouge, New Orleans,
Slidell, Nachitoches and Eunice, Plaintiffs-Appellants,
v.
HARTFORD FIRE INSURANCE COMPANY; Allstate Insurance; Aetna
Casualty and Surety Company; Cigna Corp.; et
al., Defendants-Appellees.
 Nos. 89-16405, 89-16513 to 89-16531.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 15, 1991.
Decided June 18, 1991.
 
 Thomas Greene, Deputy Atty. Gen., San Francisco, Cal., H. Ladie Montague, Philadelphia, Pa., for plaintiffs-appellants.
 Laurel Price, Deputy Atty. Gen., Trenton, N.J., for State plaintiffs-appellants.
 Bartlett H. McGuire, Davis, Polk & Wardwell, Washington, D.C., John Harkins, Philadelphia, Pa., Martin Evans, New York City, for defendants-appellees.
 Edwin A. Heafey, Jr., Raoul D. Kennedy and Richard de Saint Phalle of Crosby, Heafey, Roach & May, Oakland, Cal., defendants-appellees' liaison counsel.
 Appeal from the United States District Court for the Northern District of California.
 Before BEEZER and NOONAN, Circuit Judges, and SINGLETON,* District Judge.
 NOONAN, Circuit Judge:
 
 
 1
 Nineteen states and numerous private parties brought antitrust suits against the defendants named above. These suits were consolidated in the district court and were ultimately dismissed. The plaintiffs appeal. We reverse the district court and remand.
 
 FACTUAL BACKGROUND
 
 2
 The undisputed facts are set out by the district court in In re Insurance Antitrust Litigation, 723 F.Supp. 464, 468-70 (N.D.Cal.1989). We summarize:
 
 
 3
 Commercial general liability insurance (CGL) protects the insured against the risk of liability to third parties for bodily injury or property damage. It is purchased by businesses, nonprofit entities, and governmental units. Defendants Hartford Fire Insurance Company (Hartford), Allstate Insurance Company (Allstate), Aetna Casualty and Surety Company (Aetna), and CIGNA Corporation (CIGNA) are sellers of CGL.
 
 
 4
 In distinction from these primary insurers, there are reinsurers to whom the primary insurers turn to share their risk. The terms and availability of reinsurance directly affect the terms and availability of primary insurance. In turn, retrocessional insurance--insurance for reinsurers--has an impact on the terms of reinsurance and primary insurance. The defendant reinsurers in this case are domestic--e.g., General Reinsurance Corporation (General Re)--and also foreign. The foreign defendant companies include one Swiss corporation, Winterthur Swiss Insurance Company (Winterthur); and six "London Company Market" corporations, all of them subsidiaries of American corporations: Terra Nova Insurance Co., Ltd. (Terra Nova); Unionamerica Insurance Co., Ltd. (Unionamerica); Continental Reinsurance Co., (U.K.) Ltd. (Continental Re); Excess Insurance Group, Ltd. (Excess); Kemper Reinsurance London, Ltd. (Kemper Re); and CNA Re (U.K.) Ltd.
 
 
 5
 Reinsurance is arranged by specialized brokers and underwriters. Much reinsurance is done by syndicates doing business through Lloyd's of London. A variety of defendants here are underwriters for these reinsurance syndicates-- e.g., Merrett Underwriting Agencies Management, Ltd. (Merrett) and Three Quays Underwriting Management Ltd. (Three Quays). Thomas A. Greene and Co., Inc. (Greene) is an American reinsurance broker, a defendant here. Ballantyne, McKean and Sullivan, Ltd. (Ballantyne) and R.K. Carvill & Co., Ltd., (Carvill) are London reinsurance brokers, defendants here. There are also individual defendants associated with reinsurance--e.g., Peter North Miller, the chairman of the Council of Lloyd's, its governing body; and Robin A.G. Jackson, chief underwriter for Merrett.
 
 
 6
 Two insurance associations are also defendants. One is Reinsurance Association of America (RAA), which principally engages in lobbying. The other is the Insurance Service Office (ISO). ISO has a key role in the regulation of insurance by the several states. Formed in 1971 by the merger of eleven insurance rating bureaus, ISO is an association of over fourteen hundred property and casualty insurers. It develops standard forms of policies. It collects statistical data and estimates risks relevant to the forms. In those states where regulators formally approve the forms, ISO presents the forms for approval.
 
 
 7
 In 1984, Hartford expressed its dissatisfaction with the standard ISO form for CGL insurance. In particular, Hartford was displeased with the way the form insured against "occurrences" of liability during the life of the policy. Such insurance had "a long tail," i.e., years after the policy had expired, a claim might be made upon it for an occurrence during the life of the policy. Hartford wanted a "claims made" form to replace the "occurrences" form. Under a "claims made" form only claims made during the life of the policy would be paid. Hartford also objected to coverage of liability for accidental pollution in the standard CGL form.
 
 
 8
 Led by Hartford, the defendant primary insurers exerted concerted pressure on ISO to get it to withdraw its form for CGL insurance. In June 1984 Hartford persuaded major American reinsurers to agree to boycott the ISO form. Hartford, Aetna, Allstate and CIGNA then joined forces to persuade key underwriters at Lloyd's to agree to boycott the form. The defendants used reinsurance brokers to convey their message. Leading underwriters in London responded to the American request by threatening a boycott of insurance written on the form. ISO began to retreat. In September 1984 ISO agreed to the unprecedented presence of domestic and foreign reinsurers at its executive committee meeting of September 20, 1984. Four reinsurance underwriters from Lloyd's conveyed their insistence on Hartford's terms. Change the form or get no reinsurance was their theme. ISO responded by eliminating accidental pollution coverage and by approving a claims made form with a date after which claims could not be filed. ISO also continued to offer a CGL occurrence form.
 
 
 9
 The reinsurance defendants continued to press for elimination of the occurrence form. They announced, publicly and privately, that there would be no reinsurance for primary insurers writing on the occurrence form, and they refused to renew long-standing reinsurance treaties with primary insurers in the United States unless they agreed to abandon the occurrence form. As a result of the reinsurers' actions, primary insurers were precludedfrom selling long tail insurance and also from selling accidental pollution insurance. Whether these varieties of insurance disappeared entirely is not clear; what is alleged is that their availability was substantially diminished. In most states where a regulatory state agency approved insurance forms, ISO obtained approval of its new CGL form. Thereafter, ISO withdrew its data collection and risk-estimation support for the pre-1984 form.
 
 
 10
 In late 1985 Hartford and Aetna took the lead in urging ISO to develop standard forms for two other types of CGL insurance: umbrella and excess. With the cooperation of Merrett, Three Quays and Allstate, these standard forms were prepared and approved by ISO.
 
 
 11
 London reinsurers including Unionamerica, Terra Nova, Excess, Kemper Re and Continental Re, plus the Lloyd's underwriters Merrett and Edwards and Payne agreed to boycott reinsurance and insurance policies for United States property seepage and pollution exposures. The agreement is memorialized in the "Non Marine London Market Agreement 1987," signed by over forty retrocessional reinsurers at Lloyd's and the London Company Market. The parties to the agreement agreed to accept retrocessional reinsurance only from reinsurers who signed a letter of intent stating the following:
 
 
 12
 We hereby agree that we will use our best endeavours to ensure that all U.S.A. and Canadian exposed insurance/reinsurance business attaching on or after 1st January 1987 will only be written where the original business includes a seepage and pollution exclusion clause wherever legal and applicable.
 
 
 13
 The effect of this agreement was to deny insurance consumers in the United States property coverage for seepage and pollution.
 
 The Markets
 
 14
 As the plaintiffs have presented their case, the markets affected by the defendants' conduct are (1) the market in the United States for CGL insurance, (2) the market in the United States for excess and umbrella CGL insurance, (3) the market in the United States for property insurance, (4) the market in the United States and the United Kingdom for reinsurance, and (5) the market in the United Kingdom for retrocessional insurance.
 
 The Suits
 
 15
 The complaint filed by California is representative of the claims of Alabama, Arizona, California, Massachusetts, New York, West Virginia, and Wisconsin. In its first claim, California alleges that the American reinsurer defendants; the four primary insurer defendants; Winterthur; and Greene conspired in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1, to restrict the terms on which reinsurance would be offered for CGL risks and to refuse to provide reinsurance coverage for CGL risks unless ISO agreed to amend its 1984 CGL forms. In its second claim, California alleges that named Lloyd's underwriters; the four primary insurer defendants; and the brokers Greene and Carvill conspired to the same effect. In the third claim, California alleges that the Lloyd's underwriters; the four primary insurers; the American reinsurers; Winterthur; and Greene and Carvill conspired to the same effect.
 
 
 16
 In its fourth claim, California includes as defendants RAA and ISO together with the primary insurers; the Lloyd's underwriters; the American reinsurers; Winterthur; and Greene and Carvill. California charges them with conspiracy to eliminate pollution coverage and retroactive coverage from the 1984 claims-made form of ISO.
 
 
 17
 California's fifth claim is against five named Lloyd's underwriters; against Peter Miller and Robin A.G. Jackson; and against the London reinsurance broker Ballantyne, charging them with violation of section 1 of the Sherman Act by conspiracy to restrict the terms on which reinsurance would be provided for CGL risks; to refuse to reinsure CGL risks written on an occurrence form; and to eliminate reinsurance on long-tail risk covered by occurrence policies.
 
 
 18
 The sixth claim for relief names the Lloyd's underwriters; London company reinsurers, Unionamerica, Terra Nova, and CNA Re; and London reinsurance broker Ballantyne as conspirators to violate the Sherman Act by restricting the terms on which CGL reinsurance would be provided and by limiting the availability in the United States of pollution coverage.
 
 
 19
 In the seventh claim California charges ISO; Aetna, Allstate and Hartford; and the underwriters Merrett and Three Quays with violating the Sherman Act by agreeing to, and promulgating, model forms for umbrella and excess insurance.
 
 
 20
 The eighth claim of California is that the six named London Company reinsurers plus Merrett conspired to restrict the terms on which property insurance and reinsurance coverage would be provided for North American risks.
 
 
 21
 The ninth to eleventh claims of California are for violations of state law--of, respectively, the Cartwright Act, California Business and Professional Code, Sec. 16720 et seq.; the Unfair Trade Practices Act, California Insurance Code, Sec. 790 et seq.; and the Unfair Competition Act, California Business and Professions Code Sec. 17200 et seq. No defendants are named in these claims but it is asserted that all of the conspiracies federally charged violated the three state laws invoked here.
 
 
 22
 The complaint of Connecticut is representative of complaints filed after the California complaint by Alaska, Colorado, Connecticut, Louisiana, Maryland, Michigan, Minnesota, Montana, New Jersey, Ohio, Pennsylvania, and Washington. There is substantial overlap between the California and Connecticut complaints. Connecticut, however, in its first claim charges all of the defendants with violation of section 1 of the Sherman Act "by a conspiracy with the purpose and with the effect of shrinking the scope of CGL property/casualty insurance and reinsurance and retrocessional reinsurance in connection therewith."
 
 PROCEEDINGS
 
 23
 In March 1988 eight plaintiff states filed California-style complaints. In June 1988 ten additional states filed Connecticut-style complaints. Louisiana later joined this group, and Minnesota amended its complaint to conform to the Connecticut style. Various private plaintiffs joined in; all but two--from Illinois and Florida--were from states that were already plaintiffs.
 
 
 24
 The defendants filed five motions asking the district court to dismiss the suits for failure to state a cause of action or, in the alternative, to grant summary judgment. On October 10, 1989 the district court gave judgment for the defendants for reasons that will be taken up infra. Doing so, the district court treated its action as dismissal for failure to state a cause of action or, in the alternative, as summary judgment for the defendants. The district court accepted all the facts alleged by the plaintiffs and stated that there were "no factual disputes material to this ruling." In re Insurance Antitrust Litigation, 723 F.Supp. at 491.
 
 
 25
 Thereafter the plaintiffs moved to amend, and the district court denied the motion, observing: "The plain fact is that plaintiffs seek to recover on a theory that, as heretofore explained at length, will not stand under the law." Id. at 490.
 
 
 26
 The plaintiffs appeal.
 
 ANALYSIS
 Standing
 
 27
 The domestic and foreign reinsurers challenged the plaintiffs' standing to bring an antitrust suit against them. The district court ruled in the plaintiffs' favor. In re Insurance Antitrust Litigation, 723 F.Supp. at 482-83. The foreign reinsurer defendants press their position on this appeal.
 
 
 28
 Standing in the sense challenged depends on whether Congress in the Sherman Act intended to protect the kind of interest asserted by the plaintiffs. R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 146 (9th Cir.1989). To answer this question we look at the five factors set out in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 537-45, 103 S.Ct. 897, 908-12, 74 L.Ed.2d 723 (1983).
 
 
 29
 First: The Specific Intent of the Alleged Conspirators. The reinsurer defendants are alleged to have intended to restrict the kinds of insurance available to the plaintiffs. This factor favors standing.
 
 
 30
 Second: The Directness of the Injury. "Directness" in the antitrust context means "close in the chain of causation." R.C. Dick, 890 F.2d at 147. Accepting as we must the plaintiffs' allegations as true, there is a close connection between the conduct of the reinsurer defendants, domestic and foreign, and the damages suffered by the plaintiffs. As the district court found, "the direct effect" of the reinsurers' action was "to restrain the availability of desired coverages in the markets in which plaintiffs purchase insurance." In re Insurance Antitrust Litigation, 723 F.Supp. at 483. That the action of the reinsurers took effect through the primary insurers does not lessen the directness of these consequences which followed so closely upon the challenged conduct. The injury alleged was direct. This factor favors standing.
 
 
 31
 Third: The Character of the Damages. According to their claims, plaintiffs suffered by having to pay more for the insurance they wanted. Although the proof may be complex, it would appear that they could prove how much extra they had to pay. In the claims in which the primary insurers are charged together with the reinsurers, all of the defendants would be jointly and severally liable if the charges are true. In the claims in which the reinsurers alone are defendants, there will be a problem of allocating the damages caused by the reinsurers as distinct from the damages caused by the primary insurers, and there is a danger of duplicative recovery. To the extent of this problem and this damage, the character of the damages is against standing; but the net balance as to damages is in favor of standing.
 
 
 32
 Fourth: The Existence of Other, More Appropriate Plaintiffs. The primary insurers who were denied reinsurance could have brought suit. The theoretical possibility that such entities could have sued must be discounted by the power the allegations attribute to the London reinsurers. The 1400 members of ISO could not withstand this power. As they caved in to it, they are unlikely to desire to challenge it in court. Consumers of insurance are not subject to this restraint. Realistically, no more appropriate class of plaintiffs exists.
 
 
 33
 Fifth: The Nature of the Plaintiffs' Claimed Injury. The fifth factor is "of tremendous significance." R.C. Dick, 890 F.2d at 148, quoting Bhan v. NME Hospitals, Inc., 772 F.2d 1467, 1470 n. 3 (9th Cir.1985). For example, a plaintiff who is "neither a competitor nor a consumer" in the relevant market does not suffer "antitrust injury." R.C. Dick at 148.
 
 
 34
 In contrast, plaintiffs here were consumers of CGL insurance. As consumers, they participated in the market said to have been restrained. The antitrust laws are intended to preserve competition. They are intended to preserve competition for the benefit of consumers in the market in which competition occurs. When competition is choked off, it is the consumers who suffer. The plaintiffs here as consumers have alleged antitrust injury.
 
 
 35
 The Balance. Almost all of the Associated General Contractors factors point to the presence of standing against all of the defendants. By not challenging the plaintiffs' standing on this appeal, the defendant primary insurers and the domestic reinsurers concede the presence of the factors that establish standing. The foreign reinsurers have no characteristics that distinguish them from the domestic reinsurers. As the district court determined, the plaintiffs have standing to maintain this antitrust suit against all defendants.
 
 Standing as Parens Patriae
 
 36
 That a state as parens patriae may sue to redress a violation of the antitrust laws is well-established. Georgia v. Pennsylvania R. Co., 324 U.S. 439, 450-51, 65 S.Ct. 716, 722-23, 89 L.Ed. 1051 (1945) (conspiracy in violation of antitrust laws is a wrong "of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected.") There must, of course, be antitrust injury for an injunction to be granted. Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 109-16, 107 S.Ct. 484, 488-92, 93 L.Ed.2d 427 (1986). Each state here asserts its "quasi-sovereign interest in the health and well-being--both physical and economic--of its residents in general." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 607, 102 S.Ct. 3260, 3269, 73 L.Ed.2d 995 (1982). That interest makes each state "more than a nominal party." Id. The state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the parens patriae can vindicate by obtaining damages and/or an injunction. Id. at 605, 102 S.Ct. at 3268.
 
 The McCarran-Ferguson Act Defense
 
 37
 The district court dismissed the claims of the plaintiffs because of the McCarran-Ferguson Act immunity of the defendants. We look at the plaintiffs' allegations, accepting them as the district court did as true, to see if McCarran immunity is present.
 
 
 38
 The McCarran-Ferguson Act provides that no act of Congress "shall be construed to invalidate" any state law enacted "for the purpose of regulating the business of insurance." 15 U.S.C. Sec. 1012(b) (1988). Two relevant exceptions are added: The Sherman Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." Id. Moreover, "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." Id. Sec. 1013(b).
 
 
 39
 For the immunity to apply, therefore, the defendants must be in the business of insurance; that business must be regulated by state law; and the defendants must not have agreed to boycott, coerce, or intimidate or performed an act of boycott, coercion or intimidation.
 
 The Business of Insurance
 
 40
 The district court correctly found that the first condition was met: the defendants are in the business of insurance. Reinsurance and retrocessional insurance are as much the business of insurance as the offering of primary insurance. In re Insurance Antitrust Litigation, 723 F.Supp. at 473. Although the plaintiffs made an issue of this question in the district court, they do not seriously argue it on this appeal.
 
 State Regulation
 
 41
 Do the states regulate the conduct complained of here? The district court observed that the complaints filed by the states alleged violation of state law as well as violation of the Sherman Act. The district court concluded that these allegations were "self-defeating." Id. at 475. The states had wounded their case mortally by asserting that the defendants were liable to state regulation.
 
 
 42
 By the same token, it could be observed, the defendants by their McCarran-Ferguson Act defense conceded that their business was subject to regulation by the states, and the foreign defendants thereby undermined their claim that comity barred their being subject to American regulation. The district court recognized that the position of the foreign defendants was inconsistent but did not feel bound to resolve the inconsistency, treating the defendants' pleas as alternatives: they won either because they were subject to state regulation or, because of comity, they were subject to no American regulation. Id. at 479.
 
 
 43
 What is sauce for the goose is sauce for the gander. If defendants are to be read as offering inconsistent alternatives, so are the plaintiffs to be read. Pleading of one alternative does not destroy the foundation of the other alternative. Neither side is trapped by its pleadings.
 
 
 44
 More fundamentally, established law blocks regulation by one state of the United States of the insurance business outside the borders of that state. A state's regulation of insurance does not have extraterritorial effect within the United States. See FTC v. Travelers Health Ass'n, 362 U.S. 293, 298-99, 302, 80 S.Ct. 717, 720-21, 722, 4 L.Ed.2d 724 (1960). The court commented on the legislative history of the McCarran-Ferguson Act and concluded from H.R.Rep. 143, 79 Cong. 1st Sess. 3, which cited Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; St. Louis Cotton Compress Co. v. Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297; and Connecticut General Insurance Co. v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 that a state does not have power to regulate in any way contracts of insurance or reinsurance entered into outside its jurisdiction even though the risks covered were risks within the state. Id. 362 U.S. at 300-01, 80 S.Ct. at 721-22. The Court summed up the legislative history: "There was no indication of any thought that a State could regulate activities carried on beyond its own borders." Id. at 300, 80 S.Ct. at 721.
 
 
 45
 A fortiori, regulation by the fifty states of foreign reinsurers is beyond the jurisdiction of the states. J. Atwood & K. Brewster, Antitrust and American Business Abroad (2d ed. 1981) 1, 78. All of the arguments eloquently put by the London defendants in their objection to the application of the Sherman Act to their business apply fifty times over to the regulation of it by the individual states. State insurance schemes "do not, and could not, purport to regulate the bulk of international insurance transactions." Id. Consequently, McCarran-Ferguson Act immunity does not attach to the foreign defendants. By the same token, the claims by the states against the foreign defendants alone under state insurance laws (referencing the fifth, sixth, and eighth California claims) must be dismissed as seeking to exercise extraterritorial jurisdiction.
 
 
 46
 A different question is presented by the primary insurers, the American reinsurers, and the American insurance brokers, all of whom are subject to regulation by the states and therefore prima facie immune. The question is whether the action of these domestic defendants in combination with the foreign defendants is subject to state regulation. The states argue that it is not. They invoke the principle that "an exempt entity forfeits antitrust exemption by acting in concert with nonexempt parties." Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). Membership of an exempt entity in a conspiracy with nonexempt entities makes the exempt entity liable. Beltz Travel Service, Inc. v. International Air Transport Assoc., 620 F.2d 1360, 1366-67 (9th Cir.1980). The domestic defendants offer no rebuttal to these authorities. We conclude that the domestic defendants' immunity was lost when they conspired with the foreign defendants.
 
 Boycotts
 
 47
 A second, independent ground exists why the McCarran-Ferguson Act defense does not work for any of the defendants. The Sherman Act applies to persons or companies in the insurance business if they agreed to a boycott or engaged in acts of boycott or coercion. The allegations of the plaintiffs, here accepted as true, charge agreements by the defendants to boycott nonconforming insurers and acts of boycott and coercion. No immunity for such agreements and acts exists.
 
 
 48
 The defendants' position is that they could confer and agree on the terms on which insurance would be offered; the immunity in so doing is incontestable. But they are charged with much more: with agreeing to refuse reinsurance for CGL risks unless ISO amended its 1984 CGL form; with coercing ISO and ISO members to adopt the terms the defendants wanted; with coercing primary insurers to use the claims-made form; with agreeing to exclude from all casualty and property treaty reinsurance written in London all pollution coverage for American risks. The facts underlying these allegations are asserted in some detail, including, the actions of Hartford, CIGNA, Aetna, and Allstate in 1984 in bringing pressure on the ISO staff and other ISO members; the meeting of March 2, 1984 between representatives of Hartford and representatives of General Re when they agreed to coerce ISO to accept their demand; the successful effort of General Re with RAA so that on March 26, 1984, RAA created a committee, consisting of five of the defendant domestic reinsurers, to force revision of the ISO forms of CGL insurance; the agreement of this committee on June 15, 1984 to boycott the 1984 forms, followed by a letter from RAA to ISO on June 19, 1984, stating that the members of RAA would not provide reinsurance for coverages written on the 1984 forms; the enlistment of Thomas Greene to carry this message to ISO, as he did in a speech to the ISO directors on June 21, 1984.
 
 
 49
 Hartford, Aetna, CIGNA, and Allstate--all according to allegations that here are accepted as the truth--also took the initiative to encourage a boycott of the 1984 ISO forms by the lead underwriters of North American casualty reinsurance at Lloyd's of London and used Thomas Greene and Nick Graham of Carvill to carry the message to the London reinsurance market. As a result of these efforts, the lead underwriters, named as defendants here, met representatives of ISO at the Garrick Club in London on July 4, 1984 and indicated their resolve to eliminate the occurrence form. On September 19, 1984, at a dinner at the Board Room, a private club in New York City, a combination of representatives of the defendant domestic reinsurers and foreign underwriters communicated to ISO members their agreed demands for change. The following day ISO largely capitulated. Agreements to boycott and acts of implementation of the agreements are, in short, explicitly set forth in the complaints.
 
 
 50
 In the classic case on boycotts in the context of the McCarran-Ferguson Act, St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), four insurance companies entered into an agreement according to whose terms three of the companies would not sell insurance to doctors in order to force them to accept "new ground rules of coverage set by the fourth." Id. at 533, 98 S.Ct. at 2926. The Court found "an organized boycott" to exist, stating: "The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott." Id. at 544-45, 98 S.Ct. at 2931. That is exactly what Hartford and the other defendant prime insurers did here, always accepting the plaintiffs' allegations as true: they enlisted the reinsurers to compel capitulation by ISO and the insurers who had refused to go along with the Hartford demands. The London reinsurers did similarly in denying retrocessional coverage on policies covering pollution risks.
 
 
 51
 Congress, the Court said in St. Paul, intended to guard against "the danger that insurance companies might take advantage of purely permissive state legislation to establish monopolies and enter into restrictive agreements falling outside the realm of state-supervised cooperative action." Id. at 547, 98 S.Ct. at 2933. The states allege that Hartford and its allies engaged in precisely such conduct and that the reinsurers did the same among themselves.
 
 
 52
 The Court in St. Paul gave prominence to the explanation of the McCarran-Ferguson Act by Senator O'Mahoney, who said the vice in the insurance industry was "a system of private government which had been built up by a small group of insurance companies, which companies undertook by their agreements and understandings to invade the field of Congress to regulate commerce." Id. at 548, 98 S.Ct. at 2933. That is precisely what has happened in this case, according to the plaintiffs: the defendants have gone beyond joint action to their own regulation of the terms on which CGL and property insurance will be offered.
 
 
 53
 The district court, of course, was as familiar with St. Paul as this court is, but placed an emphasis that we do not on the Court's statement that the boycotting insurers there would not deal with the doctors "on any terms." The district court supplied italics for this phrase which is unemphasized in the Court's opinion. Compare In re Insurance Antitrust Litigation, 723 F.Supp. at 476, with St. Paul, 438 U.S. at 552, 98 S.Ct. at 2935. The issue before the Court was whether "boycott" in the McCarran-Ferguson Act meant boycotts directed against policyholders as well as boycotts directed at competitors. Id. at 552, 98 S.Ct. at 2935. The Court held the term to include both kinds of boycott. The description of the boycott at issue was not made as a definition excluding from the definition refusals to deal except on the terms demanded. The evil of a boycott is not its absolute character but the use of the economic power of a third party to force the boycott victim to agree to the boycott beneficiary's terms. So the three malpractice insurers in St. Paul used their economic power to force doctors to accept St. Paul's terms; so here, the defendant reinsurers and London underwriters used their economic power, their refusal to reinsure, to force ISO and its recalcitrant members to accept the terms Hartford and its allies wanted. They, if plaintiffs are correct in their allegations, engaged in a boycott.
 
 
 54
 The district court limited the term "boycott" in a second way, quoting Feinstein v. Nettleship Co., 714 F.2d 928, 933 (9th Cir.1983), cert. denied, 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984): "Because [the agreement] in no way limited the doctors' ability to deal with third parties, the agreement itself is not an agreement to boycott...." But this dictum is taken from its context. In Feinstein an agreement between a county medical association and an insurance agent led the defendant insurer to provide malpractice insurance only to members of the association. The plaintiff doctors could buy insurance from other insurers and did not contend that they were subject to a boycott; what they objected to was the "inherently coercive" power of the defendants' "monopoly power." Id. at 933. We observed that the plaintiffs' objection to monopoly power was an invocation of section 2 of the Sherman Act, and by its terms the McCarran-Ferguson Act gave immunity from this part of the Sherman Act. Id. at 933-34. Feinstein is patently very different from the case where boycotts are alleged by plaintiffs who say that the defendants conspired to restrict primary insurance by the reinsurers' agreement to a boycott.
 
 
 55
 Why were the charges of the complaint not as plain to the district court as they appear to be on appeal? Because the district court took the position that the insurers' and reinsurers' agreement on terms was immune and that such agreement "comprehends efforts to seek agreement by others, including those who might be unwilling to agree were it not for economic exigencies." In re Insurance Antitrust Litigation, 723 F.Supp. at 478. But when "the economic exigencies" are produced by conspirators who refuse to supply reinsurance if the unwilling insurer does not agree, a boycott is in effect and is being implemented. The defendants are charged with boycotts, and the allegations, taken as true, destroy their McCarran-Ferguson Act immunity.
 
 
 56
 Excess and Umbrella Insurance. No boycotts are alleged as the defendants' modus operandi in respect to these branches of insurance. The states say that they are parts of the insurance business unregulated by the states and so not immune under McCarran. The district court held to the contrary, finding that all of the relevant states had statutes "broad enough to apply to any persons in the business of insurance." In re Insurance Antitrust Litigation, 723 F.Supp. at 474.
 
 
 57
 The domestic sellers of excess and umbrella insurance were, as the district court held, exempt. But they engaged in agreements--so it is stated--with the non-exempt Lloyd's underwriters, Merrett and Three Quays. Their own exemption was lost by acting in concert with non-exempt parties. Group Life and Health Ins. Co., 440 U.S. at 231, 99 S.Ct. at 1083.
 
 The State Action Defense
 
 58
 If the states have no regulatory authority over the foreign entities and if combination with the latter forfeits the immunity of the domestic companies, a third line of argument advanced by some defendants works even less well for them. These defendants, referring to those states whose regulatory agencies approved the revised ISO form, contend that there was not only state regulation but state action, and that therefore they have immunity under Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The relevant states, they argue, had a clearly articulated policy to displace competition with regulation when they permitted "the collective development" of insurance policy forms and actively supervised the contents of the forms. The action by the states, they assert, insulates them under Parker entirely apart from their McCarran exemption.
 
 
 59
 Their argument fails because nothing in the affidavit evidence submitted by the defendants shows that the relevant states supervised or approved the boycotts used to produce agreement on the forms. The plaintiffs, the defendants object, produced no evidence countering their evidence. The plaintiffs did not need to do so: the defendants had made no showing of state action endorsing the boycotts.
 
 
 60
 The defendants are in the same position as the defendants in St. Paul: the policy changes desired by St. Paul were assumed by the court to have been filed with the state insurance director. The Court observed that there was no suggestion that Rhode Island, "in furtherance of its regulatory policies, authorized the concerted refusal to deal on any terms with St. Paul's policyholders." St. Paul 438 U.S. at 554 n. 26, 98 S.Ct. at 2936 n. 26. We have adopted the same distinction: state approval of one activity is not state approval of a related but distinct activity. Medic Air Corp. v. Air Ambulance Authority, 843 F.2d 1187 (9th Cir.1988). The alleged anticompetitive conduct in the present case, as in Medic Air Corp., was neither a reasonable nor necessary consequence of the conduct regulated and approved by the state. Id. at 1189. The agreements to refuse to reinsure were not state action.
 
 
 61
 The Connecticut Claim of a General Conspiracy. The London reinsurers challenged the claim in the Connecticut complaint that included both casualty and property insurance and the reinsurance and retrocessional insurance connected therewith. The district court observed that property insurance had not been alleged to have a connection with CGL insurance or with the market in which CGL insurance is sold. The district court thereupon granted the motion to dismiss this claim. In re Insurance Antitrust Litigation, 723 F.Supp. at 484.
 
 
 62
 The district court rightly objected to a defect in this claim. The plaintiffs moved to amend. The district court denied the motion. The defendants say the motion was too late. But the district court did not deny amendment because the plaintiffs moved too late. It denied amendment because the plaintiffs' entire theory "will not stand under the law." In re Insurance Antitrust Litigation, 723 F.Supp. at 490. We are free to review this legal conclusion de novo. It is not consistent with this opinion. The plaintiffs' basic theory is maintainable. On remand of the case to the district court, the plaintiffs should be afforded the opportunity to amend.
 
 Comity
 
 63
 A statute enacted in 1982 declares that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. Sec. 6a (the FTAIA). But the statute immediately adds, "unless (1) such conduct has a direct, substantial, and reasonably foreseeable effect (A) on trade or commerce which is not trade or commerce with foreign nations...." Id. The defendants contended in the district court that the FTAIA barred the plaintiffs because the conduct complained of in the London reinsurance claims related to commerce that was "wholly foreign commerce." The district court rejected this argument, holding as follows: "The subject matter of the alleged agreement, however, concerned the provision of reinsurance within the United States, and the allegations of effects in United States markets are sufficient to preclude a characterization of wholly foreign commerce." In re Insurance Antitrust Litigation, 723 F.Supp. at 486. By finding "the effects" sufficient to preclude application of the statute, the district court implicitly found that their impact on the commerce of the United States met the statutory standard of being "direct, substantial and reasonably foreseeable."
 
 
 64
 On appeal, the London reinsurers devote a single sentence in a single footnote to restating their view that the FTAIA bars the claims directed at conduct within the London reinsurance market. These defendants offer neither evidence nor authority to provide a basis for overturning the district court's holding. We reaffirm its conclusion that the FTAIA is no bar to any of the plaintiffs' claims.
 
 
 65
 The district court, however, found that international comity forbade its exercise of its jurisdiction over the British defendants. The district court acknowledged that as to this issue its application of the FTAIA might be argued to be decisive. Id. at 486, n. 28. But there were no court decisions so holding. The House Report on this legislation stated that it had "no effect on the courts' ability to employ notions of comity." H.R.Rep. No. 97-686 at 13 (1982), reprinted in 1982 U.S.Code Cong. & Admin.News at 2431, 2498. The district court prudently concluded that it should apply the analysis of comity set out in Timberlane Lumber Co. v. Bank of America, 549 F.2d 597 (9th Cir.1976) (Timberlane I ).
 
 
 66
 On appeal, the plaintiffs renew their argument: the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. Sec. 6a, is dispositive. The defendants do not reply to their argument but by implication of their insistence on Timberlane do not concede. We strike a middle position. We do not believe a Timberlane analysis (see infra ) can be unaffected by the statute. If a complaint survives the new bar of 15 U.S.C. Sec. 6a because the conduct has "a direct, substantial, and reasonable foreseeable effect" on American commerce, it is only in an unusual case that comity will require abstention from the exercise of jurisdiction. But as the legislation does not eliminate comity, a court should look to see if the case before it is one in which comity still has a role to play.
 
 
 67
 Timberlane I was an opinion of this court written by Judge Herbert Choy which "has commanded a wide following." Atwood & Brewster, Antitrust and American Business Abroad 1, 162-63. As an advance upon Judge Learned Hand's exposition of the law of extraterritorial application of American antitrust law in United States v. Aluminum Co. of America, 148 F.2d 416 (2nd Cir.1945), Timberlane was "a major development." Atwood & Brewster, 1, 163. Rejecting the simple test of the effect of the charged conduct upon American commerce, Timberlane adopted "a jurisdictional rule of reason." Timberlane I, 549 F.2d at 613. We were to "weigh" and to "balance" the various considerations--the two metaphors indicated that a court should examine each relevant factor, assign its relative importance, and come to a conclusion by comparing the relative importance of the elements involved. We now conduct this examination and evaluation in terms of the factors enumerated by Timberlane.
 
 
 68
 First: The Degree of Conflict With Foreign Law or Policy. The government of the United Kingdom has filed a brief as amicus on this appeal. That brief informs us that the Lloyd's Acts 1871-1982 provide detailed regulation of the Society of Lloyd's. The regulation is supplemented by the Insurance Companies Act of 1982, which applies to most insurance companies as well. The Restrictive Trade Practice (Services) Order exempts certain insurance services from the Restrictive Trade Practices Act of 1976. See In re Insurance Antitrust Litigation, 723 F.Supp. at 488. The district court found that application of the antitrust laws to the London reinsurance market "would lead to significant conflict with English law and policy." Id. at 489. The British brief reiterates that conclusion; we do not doubt its accuracy. Such a conflict, unless outweighed by other factors, would by itself be reason to decline exercise of jurisdiction. Timberlane Lumber Co. v. Bank of America, 749 F.2d 1378, 1384 (9th Cir.1984) (Timberlane II ), cert. denied, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985).
 
 
 69
 Second: The Nationality or Allegiance of the Parties and the Locations or Principal Places of Business of the Corporations. All of the plaintiffs are located in the United States. There is a substantial American interest in hearing their case. That interest is increased because nineteen of the plaintiffs are themselves states of the United States. The defendants named in certain counts are English or located in England. The district court found that "many of the corporate defendants," including those located in England, "are subsidiaries of American corporations and may be influenced by the allegiance of their American parents." In re Insurance Antitrust Litigation, 723 F.Supp. at 489. The interests of Britain are at least diminished where the parties are subsidiaries of American corporations. United States v. Vetco, Inc., 691 F.2d 1281, 1289 (9th Cir.), cert. denied, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981). Moreover, although some counts of the complaints have named only the English reinsurers as defendants, other counts charge them as coconspirators with American insurers. As to these counts, the interest of an American court in being able to judge claims against an American company is high. It would not make much sense to dismiss the London defendants on some counts and hold them answerable on others. On balance, the presence of the American plaintiffs, many American defendants and some American subsidiaries is a factor pointing towards the exercise of jurisdiction.
 
 
 70
 Third: The Extent to Which Enforcement by Either State Can Be Expected to Achieve Compliance. It would be unrealistic to expect a British court to enforce an American court's injunction against Lloyd's. It would not be unrealistic to expect an American court to be able to obtain compliance with its orders by the subsidiary of an American parent and to be able to affect the way the foreign defendants conducted themselves in the United States. Damages, if awarded, could be collected from assets of the foreign defendants within the United States. The decree of an American court setting out the obligations of the American insurers would undoubtedly be effective and surely would have an impact on the way the American insurers did business with the foreign defendants. Substantial compliance, in short, could be achieved. This factor is in favor of the exercise of jurisdiction.
 
 
 71
 Fourth: The Relative Significance of Effects on the United States as Compared With Those Elsewhere. The comparison led to the ultimate dismissal of the Timberlane suit in Timberlane II: the effects of the conduct charged were substantial in Honduras and minimal in the United States. Timberlane II, 749 F.2d at 1385. The case here is just the reverse. The effects are minimal, or at any rate not large in England, and they are, as implicitly found by the district court, "direct, substantial, and reasonably foreseeable" in the United States, as to which Lloyd's does at least half of its casualty underwriting. Accepting as true the plaintiffs' allegations, the actions of the foreign defendants have had the kind of "real economic consequences" for the American economy that strongly weigh in favor of the exercise of jurisdiction. See Atwood and Brewster, 1, 169.
 
 
 72
 Fifth: The Extent to Which There is Explicit Purpose to Harm or Affect United States Commerce. The purpose of the agreements to boycott was to affect the insurance business in the United States. The district court thought that the purpose was "the legitimate business purpose" of reducing the defendants' exposure to certain kinds of risks. In re Insurance Antitrust Litigation, 723 F.Supp. at 490. Both purposes existed. But in applying the jurisdictional test it is the purpose to affect American commerce that is more important. The compliance of the charged conduct with the law of the foreign jurisdiction has already been taken into account under the first factor. The fifth factor depends on the relation of the conduct to the United States: was it intended to have effects here? The answer in this case must be yes. So the complaints charge. The fifth factor strongly weighs in favor of the exercise of jurisdiction.
 
 
 73
 Sixth: The Foreseeability of the Effects on American Commerce. The district court concluded that the defendants conceded that the effects were foreseeable. Id. As intended, the effects were, of course, foreseeable. As they were substantial, their foreseeability becomes a strong factor favoring the exercise of jurisdiction.
 
 
 74
 The Balance. A single factor points toward abstention: the conflict with a long-established British policy towards a venerable British trade, the underwriting of insurance. Every other factor--nationality, likelihood of compliance, the significance of the effects on American commerce, their foreseeability and their purposefulness--points to the appropriateness of exercising jurisdiction. Unless we were to create a kind of analogue of the McCarran-Ferguson Act for insurance business regulated by a foreign country and treat Lloyd's as immune, the district court should exercise jurisdiction. No authority warrants us in creating a special immunity for insurance regulated by Britain. Comity does not require it. Nothing overcomes the weight of the findings already made under the Foreign Trade Antitrust Improvements Act. The comity factors of Timberlane indicate that the court's jurisdiction of the subject matter that exists must be exercised.
 
 
 75
 REVERSED and REMANDED.
 
 
 
 *
 The Honorable James K. Singleton, United States District Judge for the District of Alaska, sitting by designation