Walter FEINSTEIN, Jack Kriegsman, Leo Miller, Morton H. Pastor and Jason I. Green, Plaintiffs/Appellants,

v.

NETTLESHIP CO. OF LOS ANGELES, Pacific Indemnity Company, Insurance Company of North America, Sentry Insurance, American Re-Insurance Company, and North American Re-Insurance Corporation, Defendants/Appellees.

Nos. 77–3998, 82–5698.

United States Court of Appeals, Ninth Circuit.

Argued May 10, 1983.

Submitted Aug. 10, 1983.

Decided Sept. 1, 1983.

Joseph M. Alioto, Lawrence John Appel, Alioto & Alioto, San Francisco, Cal., for plaintiffs/appellants.

John W. Stamper, Philip F. Westbrook, Jr., O'Melveny & Myers, Frederick A. Clark, Carl J. Schuck, Overton, Lyman & Prince, Los Angeles, Cal., Gary H. Anderson, James Michael, Robert M. Westberg, Pillsbury, Madison & Sutro, San Francisco, Cal., John Michael McCormick, Kadison, Pfaelzer, Woodard, Ouinn & Rossi, Steven Lindsey, Myers & D'Angelo, Peter Sullivan, Gibson, Dunn & Crutcher, Douglas L. Thorpe, Los Angeles, Cal., for defendants/appellees.

Before CHAMBERS, ANDERSON and SCHROEDER, Circuit Judges.

SCHROEDER, Circuit Judge.

This is a protracted antitrust action by physicians against the insurance agent and carriers who provided medical malpractice insurance to members of the Los Angeles County Medical Association. The question is whether the defendants' alleged domination of the medical malpractice insurance market in Southern California, through an agreement with the medical association, is immune from antitrust attack. The district court held that the defendants' conduct was the business of insurance and was regulated by the state. It therefore concluded that

the antitrust claims were barred by the McCarran-Ferguson Act exemption to the antitrust laws, 15 U.S.C. § 1012. In addition, the court held that defendants' conduct did not fall within the boycott exception to that Act, 15 U.S.C. § 1013(b). It granted summary judgment in favor of the defendants. We affirm for the reasons set forth below.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs-appellants Walter Feinstein, Jack Kriegsman, Leo Miller, Morton H. Pastor, and Jason I. Green, are doctors in Los Angeles County who at various times between 1963 and 1969 purchased medical malpractice insurance through defendant-appellee Nettleship Company. Nettleship was an underwriting manager for medical malpractice insurance, and was the approved agent for the Los Angeles County Medical Association (LACMA) throughout the relevant period. Defendant Pacific Indemnity was one of the insurance carriers. The other companies named in the complaint were reinsurers.

It is undisputed that at the time this lawsuit began, most professional medical liability insurance in California was written on a group basis. The doctors negotiated with the insurance company through local medical associations. The insurance company issued a master policy to the association, and the participating physicians, in turn, received certificates of insurance.

The facts in this case reflect that pattern. In a written agreement LACMA designated the Nettleship Company the "sole and exclusive agent approved by the association." Nettleship issued a master policy to LACMA and certificates of insurance to the covered doctors. In exchange for exclusive agency, Nettleship agreed not to limit coverage to low risk areas, but to include high risk specialties as required by the members. The agreement also addressed claims handling and provided for the revision of rates, pursuant to annual reports regarding Nettleship's net profits.

In order to buy insurance through Nettleship, a physician was required to be a member of LACMA, but LACMA members were free to purchase medical malpractice insurance elsewhere if they chose. For part of the period in issue, the "exclusivity" provision was not respected, for LACMA used an additional insurance agent. Nettleship, however, gained an increasing share of the medical malpractice insurance market in Southern California, and, during the late sixties it imposed substantial, successive rate increases. In 1969, plaintiffs filed their complaint in this case alleging conspiracy to monopolize and monopolization, price-fixing and tied sales, as well as boycott, fraud and coercion.

In 1971, the district court granted the defendants summary judgment on price-fixing and related claims, on the ground that insurance rate-setting was regulated by state law and thus fell within the exemption of the McCarran-Ferguson Act. 15 U.S.C. §§ 1011–15. In 1977, the district court granted summary judgment on the remaining antitrust claims, holding that the entire action was barred by the McCarran-Ferguson Act and that the plaintiff-physicians, as policyholders, lacked standing to raise the boycott exception in 15 U.S.C. § 1013(b). The district court's holding on standing was dictated by our decision in *Addrisi v. Equitable Life Assurance Society of the United States,* 503 F.2d 725 (9th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975). After the 1977 district court decision in this case, however, that aspect of *Addrisi* was overruled by *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) which held that policyholders may invoke the boycott exception. In 1979, this court therefore remanded for reconsideration in light of *Barry.*

Following remand the district court in 1980 granted partial summary judgment for the defendants on plaintiffs' tying claims. In 1982, the district court granted summary judgment to defendants on all remaining issues on the ground that the action was barred by the McCarran-Ferguson Act and that the defendants' conduct did not consti-

tute a boycott under 15 U.S.C. § 1013(b). There is no factual dispute and we review solely to determine whether defendants were entitled to judgment as a matter of law. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,* 690 F.2d 1240, 1250 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

## II. DISCUSSION

The McCarran-Ferguson Act provides that:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance.... *Provided,* that ... the Sherman Act, and ... the Clayton Act, and ... the Federal Trade Commission Act ... shall be applicable to the business of insurance to the extent that such business is not regulated by state law.

15 U.S.C. § 1012.

Section 1013(b) of the McCarran-Ferguson Act provides that

Nothing contained in this act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

■ The McCarran-Ferguson Act creates an antitrust exemption for the business of insurance which was prompted by the Supreme Court's departure in *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) from prior holdings that insurance is not a transaction in interstate commerce. *See Barry,* 438 U.S. at 538–39, 98 S.Ct. at 928–29. The Act was passed in response to widespread concern that the states should be permitted to continue regulating and taxing the insurance industry. It provides an exemption from the antitrust laws for the business of insurance, but only to the extent that such business is regulated by the state, and does not involve a boycott, coercion or intimidation. *Id.* at 539–40, 98 S.Ct. at 2929; *Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau,* 701 F.2d 1276, 1284 (9th Cir.1983), *petition for cert. filed,* 51 U.S.L.W. 3884 (U.S. June 14, 1983) (No. 82–1969).

Plaintiffs in this appeal contend both that the defendants' agreement with LACMA was not exempt as the business of insurance, and that even if it otherwise qualifies for exemption, it falls within the boycott-coercion exception. We address these contentions in turn.

### A. *The Business of Insurance and State Regulation*

■ The Supreme Court has set forth three factors to consider in determining whether a practice constitutes the business of insurance: (1) whether the practice has the effect of transferring or spreading the policyholders' risks; (2) whether the practice is an integral part of the policy relationship between the insurer and insured; and (3) whether the practice is limited to entities within the insurance industry. *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982). This court has discussed these factors in two recent decisions, both of which emphasize that the primary characteristic of the business of insurance is the transferring or spreading of risk. *Klamath-Lake,* 701 F.2d at 1285; *United States v. Title Insurance Rating Bureau of Arizona,* 700 F.2d 1247, 1251 (9th Cir.1983). Provided the risk spreading factor is present, the business of insurance is not limited to traditionally recognized areas of insurance. *See Klamath-Lake,* 701 F.2d at 1286–87. In *Klamath-Lake,* we held that the practice of shifting the risk of pharmacy costs, as well as medical costs, qualified as the business of insurance. *Id.* at 1287.

In this case, which involves a conventional field of insurance, plaintiffs offer no very clear articulation of the practice which they seek to challenge as violative of the antitrust laws and outside the business of insurance. It appears, however, that for pur-

poses of bringing this suit outside the scope of the McCarran-Ferguson Act, plaintiffs have focused their ire upon the agreement between the medical association and the insurers to offer the malpractice insurance only to members of LACMA.

That practice is, however, demonstrably related to the allocation and spreading of risk, for, as the district court pointed out, it defines a pool of insureds over which risk is spread. The medical association sought to provide a single insurance broker for all of its members in order to assure coverage for certain high-risk specialties, thereby distributing risk across the membership. The effect is to spread risk across a wide area, and that is precisely what the Supreme Court described when it formulated the risk spreading criterion. *See Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 212–13, 99 S.Ct. 1067, 1073–74, 59 L.Ed.2d 261 (1979).

The Third Circuit identified the risk spreading characteristic of this practice when it recently held that offering insurance through a state medical association is the business of insurance. *Owens v. Aetna Life & Casualty Co.,* 654 F.2d 218 (3d Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 631 (1981). The Third Circuit underlined the fact that mass marketing of malpractice insurance through an association is one way of maximizing the risk pool of medical specialties. *Id.* at 223. The *Owens* court was further influenced by the fact that cooperative rate-making schemes have long been recognized as the business of insurance, and were clearly contemplated by the proponents of the McCarran-Ferguson Act. *Id.* at 225; *accord Royal Drug,* 440 U.S. at 222–24, 99 S.Ct. at 1078–80. These considerations apply with equal force here.

Contrary to the plaintiffs' contention, the agreement in this case is wholly unlike the agreement providing peer review of chiropractors' fees in *Pireno,* or the agreement between the insurer and pharmacists to offer low cost drugs to policyholders in *Royal Drug.* The Supreme Court held those practices were not part of the business of insur-

ance because they were aimed solely at cutting insurers' costs and had nothing to do with the allocation of risk. *Pireno,* 458 U.S. at 132, 102 S.Ct. at 3010; *Royal Drug,* 440 U.S. at 216–17, 99 S.Ct. at 1075–76. The practice here is related to risk allocation, and is not a cost-cutting device.

Despite these distinctions, plaintiffs attempt to bring their claims under the Supreme Court precedents by focusing upon the fact that this arrangement was negotiated by the medical association on behalf of its members. Their argument seems to be that since the association is neither the insured nor the insurer, the arrangement is not "limited to entities within the insurance industry" and therefore does not meet the third prong of the *Pireno* test. *See* 458 U.S. at 129, 102 S.Ct. at 3009. Plaintiffs describe LACMA, the entity which negotiated the terms of the insurance on behalf of the insureds, as "strangers" to the insurer-insured relationship. *Pireno,* however, suggests that a non-insurer (or non-insured) party's involvement does not necessarily defeat antitrust exemption, but is of concern where the agreement has the potential to restrain competition in non-insurance markets. *Id.* at 133, 102 S.Ct. at 3010–11. Thus *Pireno* appears to be satisfied where, as here, the only role of the non-insurer is in negotiating the terms of the policy relationship between insurer and insured, and the gravamen of the complaint is lack of competition in the insurance market itself.

 Offering insurance to members of a group through an association or employer which is not the insured is a practice common to all group insurance plans. R. Keeton, *Insurance Law* § 2.8(a) (1971). These occupy an increasingly larger share of the overall insurance market in the United States. *See* W. Meyer, *Life and Health Insurance Law* § 19:1 (1972); W. Vance, *Law of Insurance* § 203 (3d ed. 1951). The law generally views the intermediary who negotiates the insurance contract as the agent either of the insured or the insurer, not as a party pursuing its own objectives. *See* W. Meyer, *supra,* § 23. Plaintiffs do not offer any reason why the intermediary

should be treated differently for antitrust purposes, or why group insurance should be treated any differently from insurance obtained directly by the insured. Nor do they contend that there is any authority either in the McCarran-Ferguson Act, its history, or in any judicial interpretation, that group insurance is not "the business of insurance." Indeed, the proposition is directly contrary to the Third Circuit's decision in *Owens.* We therefore conclude that the agreement between LACMA and defendants is the "business of insurance" within the meaning of the McCarran-Ferguson Act.

To be exempt under that Act, however, a practice must not only be "the business of insurance," it must also be regulated by the state. *Royal Drug,* 440 U.S. at 219, 99 S.Ct. at 1077. It is not necessary to point to a state statute which gives express approval to a particular practice; rather, it is sufficient that a state regulatory scheme possess jurisdiction over the challenged practice. *See Klamath-Lake,* 701 F.2d at 1287 & n. 10; *Addrisi,* 503 F.2d at 728; *accord,* P. Areeda, *Antitrust Law* ¶ 210.1b (Supp.1982). California has an extensive regulatory scheme with jurisdiction over all rating practices of insurers, and which grants the insurance commissioner broad investigatory and enforcement powers. *See, e.g., Calif.Ins.Code* §§ 1852–1853.9, 12919–12931. The state regulation requirement clearly is satisfied in this case.

### B. *The Boycott-Coercion-Intimidation Exception to the McCarran-Ferguson Act*

Since we have determined that the object of plaintiffs' challenge is within the business of insurance and regulated by California, we must now consider the plaintiffs' contention that even if their suit is otherwise barred by the McCarran-Ferguson Act exemption from antitrust liability, it falls within the exception to that Act.

The McCarran-Ferguson Act specifies that antitrust exemption will not extend to "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion or intimidation." 15 U.S.C. § 1013(b). Plaintiffs do not contend that the agreement itself forced them to buy the LACMA sponsored insurance from the defendants, or that it prevented them from dealing with other insurers. The only limitation in the agreement, and of which they complain, is the requirement that doctors join LACMA as a prerequisite to being insured by defendants. Indeed, not only were doctors free to purchase insurance elsewhere, whether or not they joined LACMA, but several doctors in this case were covered by other companies at times during the relevant period. Because it in no way limited the doctors' ability to deal with third parties, the agreement itself is not an agreement to boycott or coerce the plaintiffs to purchase the defendants' insurance. *See Barry,* 438 U.S. at 553, 98 S.Ct. at 2935–36; *Klamath-Lake,* 701 F.2d at 1287–88; *Procter v. State Farm Mutual Automobile Insurance Co.,* 561 F.2d 262, 275 (D.C.Cir.1977), *vacated on other grounds,* 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979); *Travelers Insurance Co. v. Blue Cross of West Pennsylvania,* 481 F.2d 80, 84 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); *cf.* Barber, *Refusals to Deal Under the Federal Antitrust Laws,* 103 U.Pa.L.Rev. 847, 876–77 (1955) (quoted in *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 77 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970)). There is no "agreement to boycott, coerce or intimidate" within section 1013(b).

Plaintiffs do not contend otherwise, but stress instead that because as a practical matter, the defendants' plan became the only medical malpractice plan available to doctors in the Los Angeles area, they were forced to buy this insurance. They argue that the existence of defendants' monopoly power was inherently coercive, and is therefore within the boycott-coercion exception. Plaintiffs' theory thus rests squarely upon an attempt to equate section 2 monopolization claims with the McCarran-Ferguson Act exceptions; for several reasons, it must fail.

First, the Supreme Court expressly stated in *Barry* that the boycott and coercion ex-

ceptions are not as broad as the Sherman Act itself.

We note our disagreement with Mr. Justice STEWART's expression of alarm that a reading of the operative terms of § 3(b), consistent with traditional Sherman Act usage, "would plainly devour the broad antitrust immunity bestowed by § 2(b)." *Post,* at 2938. Whatever the precise reach of the terms "boycott," "coercion," and "intimidation," the decisions of this Court do not support the dissent's suggestion that they are coextensive with the prohibitions of the Sherman Act. *See, e.g., Eastern States Lumber Ass'n v. United States,* 234 U.S. 600, 611, 34 S.Ct. 951, 954, 58 L.Ed. 1490 (1914), quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 438, 31 S.Ct. 492, 496, 55 L.Ed. 797 (1911).

438 U.S. at 545 n. 18, 98 S.Ct. at 2932 n. 18.

■ Thus even if plaintiffs could establish a violation of section 2 of the Sherman Act in this case, some additional act or agreement constituting boycott, coercion or intimidation would have to be shown. None is alleged.

The legislative history of the McCarran-Ferguson Act further repudiates plaintiffs' position. During the debate on the proposed bill, Senator Ferguson clearly distinguished between monopolistic practices on the one hand and boycott, coercion or intimidation on the other. He explained that monopolistic practices, within the business of insurance and regulated by the state, would be permitted under the statute, while boycotts, coercion or intimidation would

not. 91 Cong.Rec. 480–81 (1945) (statement of Sen. Ferguson).[1] Monopoly alone is therefore not within any exception to the McCarran-Ferguson Act.

There is still an additional flaw in plaintiffs' argument. To recover, they must show not only that they have in some sense suffered the effects of boycott, coercion or intimidation, but that there has been some violation of the antitrust laws. *See Pireno,* 458 U.S. at 127, 102 S.Ct. at 3007. Thus in order to succeed, they cannot rest solely upon the position that a monopoly is "coercive" within the meaning of the McCarran-Ferguson Act exception. They must also persuade the court to hold that the existence of monopoly power alone is a section 2 violation of the Sherman Act.

■ Although such an approach to monopolization liability has been discussed approvingly, *see* L. Sullivan, *Law of Antitrust* § 38 at 104 & n. 6 (1977), it is not accepted in this circuit. Our cases hold that a section 2 monopolization claim requires two principal elements in addition to antitrust injury: (1) possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that power. *Betaseed, Inc. v. U and I, Inc.,* 681 F.2d 1203, 1230 (9th Cir.1982); *Phonetele, Inc. v. American Telephone and Telegraph Co.,* 664 F.2d 716, 739 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); *Greyhound Computer Corp., Inc. v. International Business Machines Corp.,* 559 F.2d 488, 492 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).

---

1. Relevant portions of the Senate debate on the proposed bill are set forth below.

Mr. FERGUSON. * * * [B]y no means does the bill *anticipate* that any act would or should be passed which would create monopoly.

Mr. O'MAHONEY. Then, does the Senator believe that the bill as it now stands *permits* that interpretation?

Mr. FERGUSON. *It would permit it.* * * I think the bill is broad enough to allow a state to pass a law allowing any agreement or contract other than those inhibited in paragraph (b) of section 4. But it is not the purpose of the bill at all to foster monopoly, or to anticipate that any act will be passed

permitting or even encouraging monopoly. *A state law * * * relating* to regulation, for instance, the fixing of rates, or the fixing of the terms of a contract of insurance, *which might under some definitions of monopoly be monopolistic, would be permitted under the pending bill;* but if the state law undertook to authorize a boycott, a coercion, or an intimidation, or an agreement to do any one of those three things, then it would be clearly void because Congress would have already spoken, and once Congress speaks on interstate commerce, no state can speak contrary to the congressional declaration. 91 Cong. Rec. 480–81 (1945) (emphasis added).

Plaintiffs insist that it is sufficient to allege that defendants had a "mere" monopoly. We require more from a section 2 claimant for, as we recently stated,

> [i]t is the second element, the conduct element, which distinguishes lawful possession of monopoly power from unlawful possession of monopoly power. Section 2 of the Sherman Act proscribes "monopolization"; it does not render unlawful all monopolies.

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 543 (9th Cir.1983). Thus plaintiffs' theory of recovery, which is bottomed solely upon their view of the oppressive nature of monopoly, would not constitute a claim of antitrust violation. We plainly cannot hold that the exception to the McCarran-Ferguson Act is a broader ground for liability than the Sherman Act itself, a conclusion which is the inevitable result of plaintiffs' logic.

Plaintiffs raise additional arguments on appeal in this thirteen-year-old lawsuit which, as we observed in addressing like arguments in a similarly protracted antitrust suit, seek only to sustain this action's "flickering life." *Klamath-Lake,* 701 F.2d at 1292. We are persuaded upon reviewing the record that the district court considered the facts which plaintiffs alleged as true, and complied fully with the dictates of Fed. R.Civ.P. 56. *See Clipper Exxpress,* 690 F.2d at 1250. The plaintiffs claim for the first time on appeal that there is a triable issue of fact with respect to their tying claims, but we decline to address that issue for the first time at this stage. *See Scott v. Pacific Maritime Ass'n,* 695 F.2d 1199, 1203 (9th Cir.1983); *Fitzgerald v. Century Park, Inc.,* 642 F.2d 356, 359 (9th Cir.1981).

The judgment of the district court is affirmed.