**UNIFORCE TEMPORARY PER-SONNEL, INC., and Uniforce Services, Inc., Plaintiffs,**

**v.**

**NATIONAL COUNCIL ON COMPENSATION INSURANCE, INC., a Florida not for profit corporation; National Council on Compensation Insurance, an unincorporated business entity; National Workers' Compensation Reinsurance Pool, an unincorporated business entity; Liberty Mutual Insurance Company; Travelers Insurance Company; and Insurance Company of North America, Defendants.**

**No. 94–8343–CIV.**

United States District Court, S.D. Florida.

April 6, 1995.

common law would supply the rule-of-decision, we would read *Maslin* as governing the decision.

J.D. Humphries, III, Atlanta, GA, for plaintiffs.

Guy C. Quinlan, New York City, James H. Carroll, Ft. Lauderdale, FL, for defendants.

## SUMMARY FINAL JUDGMENT

RYSKAMP, District Judge.

### INTRODUCTION

This matter is before the Court on the joint motion of defendants National Council on Compensation Insurance, Inc. ("NCCI"),[1] National Workers Compensation Reinsurance Pool (the "Pool"),[2] Liberty Mutual Insurance Company ("Liberty"), Travelers Insurance Company ("Travelers"), and Insurance Company of North America ("INA") for summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure, dismissing the complaint.[3] For the reasons set forth

1. The complaint also names as a defendant "National Council on Compensation Insurance, an unincorporated business entity." In its answer NCCI states that it is the successor in interest to the unincorporated business entity, which ceased to exist in 1993.

2. In their papers, defendants state that the Pool is not a separate juridical entity, but merely a reinsurance contract among participating insur-

ance carriers. For purposes of the present motion, it is unnecessary to resolve this issue.

3. In the original complaint, plaintiffs Uniforce Temporary Personnel, Inc. and Uniforce Services, Inc. (sometimes collectively referred to herein as "Uniforce") named as defendants only NCCI, the predecessor unincorporated business entity, the Pool, and "John Does (1), (2) and (3)." After the pending motion had been fully briefed, Uniforce served a First Amended Complaint, sub-

below, the Court concludes that the motion for summary judgment should be, and hereby is, granted.

*The Parties*

Uniforce is engaged in the business of providing temporary employee services. (First Amended Complaint (hereinafter "Compl."), ¶ 7). In that connection, Uniforce and its affiliates have purchased workers' compensation insurance in the fifteen states[4] in which they have done business since 1990. Each of the states in question provides a mechanism, commonly referred to as an "assigned risk plan," pursuant to which employers which are unable to self-insure, or to obtain workers' compensation insurance in the voluntary market, are able to obtain workers' compensation coverage. (Vieweg Aff. ¶ 3). Uniforce and its affiliates have obtained workers' compensation insurance through the assigned risk plans in all of the fifteen states where they do business. (Compl. ¶¶ 23, 38, 44–45; Vieweg Aff. ¶ 5).

Defendant NCCI is a non-profit corporation which serves as a state-licensed statistical rate-making and/or rating organization for workers' compensation insurance in a number of states. In this connection, NCCI assists insurers writing workers' compensation policies in ratemaking related activities, in the development of statistical plans, the collection and distribution of data, and the preparation and distribution of manuals and other materials. (Vieweg Aff. ¶ 2). NCCI is also the state-designated administrator of assigned risk plans in twenty-four states. (*Id.* ¶ 3).

The Pool is a contractual risk-sharing mechanism among certain insurers providing workers' compensation insurance through the assigned risk plans in various states. State laws customarily require each insurer which writes voluntary workers' compensation coverage in that state to accept a percentage of assigned risk coverage as well. Some but not all insurers choose to satisfy this statutory obligation by reinsuring through the Pool, and apportioning operating results from the assigned risk business in proportion to the insurers' market shares of the voluntary business. (Vieweg Aff. ¶ 4).

Not all insurance carriers which discharge their assigned risk obligation through the Pool actually write policies in the assigned risk market. In most states, this function is delegated to designated insurers, referred to as "servicing carriers," which write the assigned risk policies, collect premiums, provide loss control services, and generally perform the other services required of a workers' compensation carrier. As compensation for these services, the servicing carriers are permitted to deduct a specified percentage of the premium to defray expenses (referred to as the "servicing carrier fee") before remitting the balance to the Pool. (Compl. ¶ 38; Vieweg Aff. ¶ 4).

*The Claims*

Plaintiffs allege that, as a result of concerted action on the part of defendants, Uniforce and its affiliated companies have been unable to purchase workers' compensation coverage in the voluntary market, and as a result have been forced to purchase such insurance through assigned risk plans, where the premiums are typically higher. (Compl. ¶¶ 43–45). Once plaintiffs were in the assigned risk market, they contend, defendants utilized the rules under the assigned risk plans to combine affiliated insureds in order to generate excessive premiums. (Compl. ¶ 50). Plaintiffs also allege that defendants have commenced "coercive" and "punitive" litigation against Uniforce and its affiliates, with the intent to harm their business, and that defendants have combined to set servicing carrier fees at unreasonably high levels. (Compl. ¶¶ 47–49).

stituting Liberty, Travelers, and INA for the "John Doe" defendants. Liberty, Travelers and INA have joined in the motion for summary judgment, and the parties have stipulated that the motion may be deemed addressed to the First Amended Complaint.

**4.** Alaska, Connecticut, The District of Columbia, Kansas, Massachusetts, Michigan, Missouri, New Hampshire, New Mexico, North Carolina, South Carolina, Oregon, Tennessee, Texas and Virginia. The states in question are not identified in the complaint, but are listed in the affidavit of William F. Vieweg in support of defendants' motion (hereinafter "Vieweg Aff.", ¶ 5), which Uniforce has not controverted on this point.

In Count One of the First Amended Complaint, plaintiffs assert (Compl. ¶¶ 58–72) that the alleged activities of defendants constitute monopolization, attempted monopolization, or conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In Count Two (Compl. ¶¶ 73–79), plaintiffs assert that the same alleged conduct constitutes an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In Count Three (Compl. ¶¶ 80–104), plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, stating that the entity combination rules under the assigned risk plans constitute a violation of the equal protection and due process clauses of the Fourteenth Amendment. In Count Four (Compl. ¶¶ 105–111), plaintiffs seek a declaratory judgment "establishing whether the NCCI and the Pool are insurance carriers themselves, and declaring what state has overall responsibility for regulating and supervising the business of the NCCI and the Pool as it affects Plaintiffs' businesses." (Compl. ¶ 111). Count Five (Compl. ¶¶ 112–117) consists of a prayer for injunctive relief, and does not set forth a separate theory of recovery.

## DISCUSSION

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

5. Plaintiffs urge in their opposing memorandum ("Pl.Mem." at p. 7) that summary judgment should not be granted at this time because they have not had "adequate time for discovery." Because the instant motion is addressed solely to the legal sufficiency of Uniforce's claims, and because "[p]laintiffs identify no other possibly discoverable fact that would be material to the legal issues before us," this contention is without merit. *Sandy River Nursing Care v. Aetna Casualty*, 985 F.2d 1138, 1141 (1st Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 70, 126 L.Ed.2d 39 (1993).

6. The McCarran–Ferguson Act provides in pertinent part:

Sec. 2(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several states which relate to the regulation or taxation of such business.

judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ No disputed issues of material fact are presented by the instant motion, which in effect challenges the legal sufficiency of the claims asserted in the First Amended Complaint.[5] The only material relied upon by defendants in support of the motion, outside the four corners of the complaint, consists of the affidavit of William F. Vieweg, dated October 19, 1994, attaching (a) state statutes and regulations concerning workers' compensation insurance for each of the states in which Uniforce purchased such insurance and (b) a copy of the complaint in one of the litigations commenced by NCCI against Uniforce. The authenticity of these documents is not disputed, and in any event the Court may take judicial notice of such materials.

### The Antitrust Claims

Defendants first contend that both of plaintiffs' antitrust claims (Counts One and Two) are barred by the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, which exempts from federal antitrust liability activity which (1) constitutes the business of insurance, (2) is subject to state regulation, and (3) is not an agreement or act of boycott, coercion, or intimidation.[6] Although plaintiffs dispute the applicability of the statute, the Court holds that the McCarran–Ferguson Act does operate here to bar plaintiffs' claims under the Sherman Act.

Sec. 2(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

Sec. 3(b) Nothing contained in this Chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

15 U.S.C. §§ 1012–1013.

Initially, the McCarran–Ferguson Act only exempts conduct which may be characterized as the "business of insurance." 15 U.S.C. 1012(a). The Supreme Court has relied upon the following standard in determining whether the challenged acts of defendants constitute the "business of insurance": "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982). *See also Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261, *reh'g denied*, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979).

■ The activities complained of by plaintiffs fall squarely within this definition of the business of insurance. Plaintiffs' claims are centered on the defendants' purported conspiracy to set "excessive" premiums and servicing carrier fees which have the alleged result of forcing plaintiffs to pay higher premiums for workers' compensation insurance in the more costly assigned risk market. The setting of insurance rates and premiums, however, clearly reflects the transfer of risk for the policyholder. *See SEC v. National Sec., Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) ("[c]ertainly the fixing of rates is part of this business [of insurance]"); *Royal Drug*, 440 U.S. at 224, n. 32, 99 S.Ct. at 1080, n. 32 ("[i]t is clear from the legislative history [of the McCarran–Ferguson Act] that the fixing of rates is the 'business of insurance'"). Further, the establishment of an expense allowance (the servicing carrier fee) for insurance companies issuing workers' compensation policies in conjunction with a state-approved system for allocating assigned risk insureds also falls within the business of insurance. *See Owens v. Aetna Life & Casualty Co.*, 654 F.2d 218, 222 (3d Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 631 (1981) (McCarran–Ferguson Act covers such activities as classification and allocation of risk); *Feinstein v. Nettleship Co.*, 714 F.2d 928, 932 (9th Cir. 1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984).

Plaintiffs' challenges to the level of premiums paid to their insurers and the type of policy they were allegedly compelled to purchase from their insurers ultimately focus on (1) the insured which is to pay the premium, (2) the amount of premium to be paid, and (3) the insurer to which the premium must be paid. Plaintiffs' claims therefore address all fundamental aspects of the insurer/insured relationship.

■ Plaintiffs' contention that defendants are not "entities within the insurance industry" is without merit. The McCarran–Ferguson Act is not limited to the activities of insurance companies, but also covers those of other entities, such as NCCI, which operate within the insurance industry. *See e.g., Pireno*, 458 U.S. at 133, 102 S.Ct. at 3011; (McCarran–Ferguson "intended primarily to protect 'intra-industry cooperation'" but not limited to parties within the industry); *Owens*, 654 F.2d at 230–32 (McCarran–Ferguson applies to activities of rating organization). *See also Hartford Fire Ins. Co. v. California*, ––– U.S. –––, –––, 113 S.Ct. 2891, 2901, 125 L.Ed.2d 612 (1993) ("'the business of insurance' should be read to single out one activity from others, not to distinguish one entity from another"). Indeed, Judge Wright in the Eastern District of Arkansas recently held that NCCI, acting as an assigned risk plan administrator, was an entity which was entitled to McCarran–Ferguson immunity. *Calico Trailer Manuf. Co., Inc. v. Insurance Co. of N. Am.*, No. LR–C–93–717, slip op. at 18, 1994 WL 823554 (E.D.Ark. Oct. 12, 1994).

■ Second, in order to be exempt under McCarran–Ferguson, the alleged activity must be subject to state regulation. The state regulation prong is met if the state regulatory agency has jurisdiction generally over the challenged practices and maintains the authority to approve or prohibit the activities. *See F.T.C. v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958) (per curiam) (alleged deceptive advertising regulated under state's unfair trade practices act); *In re Workers' Compensation Ins. Antitrust Litig.*, 867 F.2d 1552, 1556 (8th Cir.), *cert. denied sub. nom.*, 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593, *cert.*

*denied sub. nom.,* 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 39 (1989) (statute vesting insurance commissioner with the power generally to regulate or to supervise practices within the insurance industry sufficient to satisfy state regulation requirement under McCarran–Ferguson); *Feinstein,* 714 F.2d at 933.[7]

■ In support of their motion, defendants have provided the Court with a compendium of the various workers' compensation statutory schemes in the fifteen states in which plaintiffs purchased policies. (Vieweg Aff., Exhs. "A"–"O"). It is readily apparent that in each state the Insurance Commissioner or Department has the authority to approve rates and to establish an assigned risk plan by which insureds unable to obtain workers' compensation insurance voluntarily can purchase such coverage. Within each scheme, the regulator has the power to approve and oversee the adoption and operation of rules and procedures under the assigned risk plan. These procedures for implementing the assigned risk system, including the use of experience modification guidelines, combination rules and the compensation of servicing carriers for the market are thus within the ambit of the regulatory structure.[8]

Plaintiffs admit in their papers that in the states at issue, "NCCI has the naked and superficial imprimatur of state regulation once NCCI's plan is adopted by a state as its plan, and the NCCI is appointed as plan administrator." (Pl.Mem. at 4). Although plaintiffs attempt to dismiss such regulation as "perfunctory," defendants need only to establish this general regulatory framework under McCarran–Ferguson.

■ Plaintiffs offer several other arguments designed to demonstrate that the McCarran–Ferguson immunity is not available to defendants. First, plaintiffs assert that defendants' actions constitute acts of "boycott, coercion or intimidation" which excludes these activities from the McCarran exemption. In *Hartford Fire Ins. Co. v. California,* —— U.S. ——, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), the Supreme Court held that the term "boycott" under the McCarran–Ferguson Act constituted a coercive refusal to deal in collateral transactions with the plaintiff as a means to coerce terms respecting a primary transaction. —— U.S. at —— –——, 113 S.Ct. at 2912–13. Plaintiffs here complain only of the premiums they are forced to pay on their policies as a result of defendants' alleged concerted activities. They do not allege that defendants somehow refused to deal with them on collateral transactions as a means to force them into paying these higher premiums. Consequently, plaintiffs have not properly alleged a "boycott" under the McCarran–Ferguson Act.[9]

■ Next, plaintiffs allege that the defendants' activities are not regulated by any one state and thus do not fall within the scope of McCarran. This argument is rebutted by the actual language of the statute, which by its terms specifies that the business of insurance shall be "subject to the laws of the several states" which relate to the regulation of such business. 15 U.S.C. § 1012(a).

---

7. *F.T.C. v. Ticor Ins. Co.,* 504 U.S. 621, 621, 112 S.Ct. 2169, 2171, 119 L.Ed.2d 410 (1992), cited by Uniforce on the subject of McCarran–Ferguson state regulation, actually involved an entirely different issue, the "active supervision" prong of the state action doctrine first enunciated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Even as to state action, it is doubtful whether Uniforce's allegations as to the supposedly poor quality of the state regulation would be sufficient as a matter of law. *See Ticor,* 504 U.S. at 633–35, 112 S.Ct. at 2177 (purpose of active supervision inquiry under the state action doctrine "is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices"). Indeed, plaintiffs acknowledge (Pl.Mem. at p. 4) that in an earlier antitrust action NCCI obtained summary judgment on state action grounds. *Gulf Marine Repair Corp. v. Liberty Mut. Ins. Co.,* 1994

WL 805208, 1994 U.S.Dist. Lexis 1685 (M.D.Fla. 1994), *aff'd.,* 46 F.3d 70 (11th Cir.1995). However, since the instant motion is not based on the state action doctrine, it is unnecessary to resolve this issue.

8. Indeed, plaintiffs conceded during oral argument that each respective state regulator would have the authority to address each of these practices had plaintiffs first raised their concerns in that forum rather than in this Court.

9. Once it is determined that the allegations of the complaint do not amount to a "boycott" within the meaning of McCarran–Ferguson, it follows that the same alleged actions "do not constitute 'coercion' or 'intimidation' within the meaning of the statute." *Hartford,* —— U.S. at ——, n. 6, 113 S.Ct. at 2915, n. 6.

Moreover, the activities challenged are subject to regulation in each of the states at issue. This is sufficient to trigger application of the McCarran–Ferguson Act. *See F.T.C. v. National Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); *Ohio AFL–CIO v. Insurance Rating Bd.,* 451 F.2d 1178, 1183 (6th Cir.1971), *cert. denied,* 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972) ("[w]e are confident that Congress in enacting the McCarran Act did not intend to impose a uniform standard of regulation upon all of the states. It is our view that the congressional intent was to leave to the judgment of each state the specifics of regulation which it should see fit to adopt.").

■ Uniforce also asserts that the amount of the servicing carrier fees is not regulated by the states, and that the alleged agreement to charge excessive servicing carrier fees therefore falls outside the scope of the McCarran–Ferguson exemption. Even assuming this assertion to be correct, however, Uniforce has no standing to maintain an antitrust claim with respect to such fees, which were paid not by plaintiffs but by the non-servicing insurance carriers. *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, *reh'g denied,* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977). As the Eleventh Circuit explained in *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial, Inc.,* 919 F.2d 1517, 1519–20 (11th Cir.1990), *cert. denied,* 502 U.S. 815, 112 S.Ct. 68, 116 L.Ed.2d 43 (1991):

Under Section 4 of the Clayton Act, 15 U.S.C.A. § 15 (Supp.1990), "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ..." for treble damages. This broad formulation has been judicially circumscribed, inter alia, by requiring a plaintiff to demonstrate what has been termed "antitrust standing." See *Associated Gen. Contractors of Cal. v. Cal. St. Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

\* \* \* \* \* \*

In Assoc. Contractors, the Court applied a series of interrelated factors in addressing the issue whether the plaintiff union had standing to bring an antitrust action against contractors who were allegedly exerting pressure on other contractors and subcontractors to hire only nonunion labor: (1) intent; (2) the causal connection between the alleged antitrust violation and the injury; (3) the nature of the injury, including whether the injury is of the kind that the antitrust laws were intended to redress; and (4) *the directness or indirectness of the injury, including the existence of an identifiable class of persons who are more direct victims, and including the problem of duplicative recovery or complex apportionment of damages.* [footnote omitted, emphasis supplied]

Following these principles, the courts have consistently denied antitrust standing to plaintiffs who claim that their costs were increased by the "passing on" of overcharges extracted by the defendant from a more direct class of purchasers. In *Illinois Brick* the U.S. Supreme Court reaffirmed "the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." 431 U.S. at 735, 97 S.Ct. at 2069. In the present case, any antitrust claim arising from allegedly excessive servicing carrier fees can only be brought by the non-servicing carriers which paid such fees, not by insureds who claim that their premiums were indirectly impacted by the alleged overcharge. *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1451 (11th Cir.1991); *Austin v. Blue Cross & Blue Shield,* 903 F.2d 1385, 1389 (11th Cir.1990).

For all of the foregoing reasons, plaintiffs' antitrust claims in Counts One and Two are barred by the McCarran–Ferguson Act. Even were that not to be the case, however, the antitrust claims must be dismissed for several other reasons as well.

■ Defendants argue that plaintiffs' claims are also precluded by the "filed rate doctrine" articulated by the Supreme Court in *Keogh v. Chicago & N.W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) and *Square D. Co. v. Niagara Frontier Tariff*

*Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). This doctrine precludes a plaintiff from asserting an antitrust claim for damages based on the grounds that a rate filed with and approved by a regulator as reasonable was nonetheless excessive or inadequate because it was the product of an anticompetitive conspiracy or other unlawful conduct by defendants. *Id.*

■ Claims for damages based on a rate other than the filed rate approved by the regulator are prohibited to "(1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved...." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 488 (8th Cir.), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992). The doctrine applies whenever a claim for damages would be "measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue." *Id.* at 488.[10]

■ The instant situation presents an especially compelling case for the application of the doctrine. As was stated by the Eighth Circuit in *H.J.,* "the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." 954 F.2d at 489. Here, as noted, plaintiffs directly attack the actions of state regulatory authorities in putting the regulators' "imprimatur" on allegedly "excessive" and "exorbitant" rates. In order for this Court or a jury to award damages, it would be necessary to measure the difference between the properly approved workers' compensation insurance rates paid by plaintiffs and those mythical rates which would have been applicable but

for the defendants' concerted activity. This undertaking is not within the province of the courts but should reside with the respective state regulators with authority over rate-setting. *See Calico,* slip op. at 15 (relying upon the filed rate doctrine to dismiss claims based on allegations of excessive workers' compensation insurance premiums because to rule otherwise "would disturb the Insurance Commissioner's rate-making decision").[11] Accordingly, plaintiffs' claims for damages fall squarely within the filed rate doctrine. For this reason as well, their Sherman Act causes of action must be dismissed.

■ Plaintiffs also base their antitrust claims on an alleged conspiracy among defendants to engage in coercive litigation targeting plaintiffs and others in the temporary employment industry for the purpose of driving them out of business. Defendants respond by arguing that the Supreme Court has established that parties petitioning the government for redress are immune from federal antitrust scrutiny, an immunity which extends to defendants' choice to utilize the judicial system. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, *reh'g denied,* 365 U.S. 875, 81 S.Ct. 899, 5 L.Ed.2d 864 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972) (*Noerr–Pennington* immunity has been applied to "the approach of citizens ... to administrative agencies ... or to courts").

In this regard, the Court again finds defendants' position to be persuasive. In *Pro-*

---

**10.** As has been recognized by the Eleventh Circuit, the filed rate doctrine is applicable in cases concerning state rates as well as is in those concerning federal rates. *See Taffet v. Southern Co.,* 967 F.2d 1483, 1494 (11th Cir.) (en banc), *cert. denied sub. nom.,* —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992) (the rationale underlying the filed rate doctrine applies "whether the rate at issue has been set by a state rate-making authority or a federal one").

**11.** Plaintiffs imply that the filed rate doctrine is inapplicable if the unlawful activity of the defendants is not presented to the regulator setting the rates. It is well-settled, however, that there is no

fraud exception to the filed rate doctrine. *See Taffet,* 967 F.2d at 1494–95. Moreover, the cases relied upon by plaintiffs are inapposite. *Brown v. Ticor Title Ins. Co.,* 982 F.2d 386, 394 (9th Cir.1992), involved a unique situation in which the state did not "meaningfully review" the rates in question; plaintiffs do not suggest that such is the case for any of the subject states here. *City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173 (8th Cir.1982), *cert. denied sub. nom.,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983) concerned defendant's alleged anticompetitive combination of rates and thus did not present the same type of direct challenge to the level of rates raised by plaintiffs in the instant action.

*fessional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Supreme Court explicitly extended the *Noerr–Pennington* immunity to protect parties engaged in litigations, so long as the lawsuits at issue did not constitute a sham. Here, plaintiffs have not alleged that defendants' litigations against them represent "the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." —— U.S. at ——, 113 S.Ct. at 1929. To the contrary, defendants have submitted to the Court a copy of a 178–page complaint in one of the actions which hardly appears frivolous. (Vieweg Aff., Exh. "P"). Plaintiffs have not alleged that any of these litigations have been dismissed, or that they are objectively baseless. Consequently, defendants' series of litigations against plaintiffs may not serve as a basis of plaintiffs' antitrust claim.

■ Finally, the Court notes that plaintiffs' claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, is deficient as a matter of law, because Uniforce does not allege either that it is a competitor in the insurance industry, or that defendants compete in the temporary help industry. *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336 (11th Cir.1987); *Official Airline Guides, Inc. v. F.T.C.*, 630 F.2d 920, 925–26 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981) (no claim for monopolization where the "challenged acts or practices" were not "engaged in to benefit the monopolist competitively, either in the market in which the monopoly power existed or in some adjacent market into which the monopolist had extended its operations," and where the alleged monopolist was "engaged in a different line of commerce" from the allegedly injured parties). As the Eleventh Circuit noted in *Ad–Vantage*, 849 F.2d at 1348–49:

A clear view of the yellow pages market structure also obviates application of the case most heavily relied upon by Ad–Vantage, that being *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In Aspen, the Supreme Court held that a monopolist may not refuse to deal with a competitor *where that refusal is designed to impede competition* and is not based on legitimate business reasons. Aspen, by its terms, applies in *a situation where there is competition and competitors.* Here, where Ad–Vantage could prove that GTEDC and Ad–Vantage competed, i.e., in the sale of national advertising, it could not prove that GTEDC was a "monopolist," i.e. in the sale of local advertising in its own directory, it could not demonstrate that Ad–Vantage competed with GTEDC. *In order to demonstrate "an area of effective competition" one must establish a competitive relationship.* Ad–Vantage failed to do so. [footnote omitted, emphasis supplied]

■ In sum, plaintiffs' claims under both Sections 1 and 2 of the Sherman Act are insufficient as a matter of law. Counts One and Two of the First Amended Complaint therefore must be dismissed.[12]

*Constitutional Claim*

In Count Three of the First Amended Complaint, plaintiffs contend that the method by which their insurance premiums were calculated, and in particular the aggregation of loss histories for affiliated corporations, violates the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution. (Compl. ¶¶ 80–104). They seek a declaratory judgment invalidating the entity combination rules under the respective state assigned risk plans. At the oral argument on March 16, 1995, the

12. Uniforce also states (Compl. ¶ 69) that it has suffered discrimination with respect to its insurance premiums "contrary to 15 U.S.C. § 13 [Section 2 of the Clayton Act; Section 1 of the Robinson–Patman Act] if such act applied to services, and not just commodities," but apparently does not seek to assert a claim under that statute. In any event, the Robinson–Patman Act is limited by its express terms to "commodities," and has consistently been held not to apply to services or other intangibles. *See, e.g., Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir.), *reh'g denied*, 788 F.2d 1223 (7th Cir.1986); *TV Signal Co. v. AT & T*, 462 F.2d 1256 (8th Cir.1972). Insurance services have specifically been held not to constitute "commodities" under the Act. *Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527 (7th Cir. 1974).

Court sought to clarify the nature of plaintiffs' constitutional claim (Transcript, 15–16):

THE COURT: Under your Fourteenth Amendment argument are you complaining about substantive due process or procedural due process?

MR. HUMPHRIES: Both. The argument distilled to the nutshell is that under the state laws which adopt the NCCI's plan, that *without notice, without hearing,* without an opportunity to be heard, companies that are owned by different shareholders can be arbitrarily combined as a matter of law, *and while you have a remedy under state law,* it would take you, depending upon the state, one to three years to get a hearing and get that adjudicated, during which point in time your insurance premiums have escalated, and depending upon the business, you could well be out of business.

What I am saying is that you have a determination that is made without a hearing, without notice, that takes your substantive rights and takes your procedural rights and violates them by permitting the NCCI to combine entities on a sparsity of information and with no hearing, with no opportunity to be heard.

THE COURT: I thought you said there was a provision for a hearing and administrative review?

MR. HUMPHRIES: After the fact.

THE COURT: That's often the fact, that it's an after-the-fact hearing. If an employee is fired and they ask for a hearing, then it's very often an after-the-fact hearing, but that's due process—

MR. HUMPHRIES: Right.

THE COURT: —nevertheless under the Loudermill [*Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ] case. [emphasis supplied]

▆▆▆ This concession definitively negates plaintiffs' procedural due process claim. The Fourteenth Amendment does not protect against all deprivations of property, but only those for which state law fails to provide

adequate means of redress. *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 1913–14, 68 L.Ed.2d 420 (1981). It is equally well settled that "post-deprivation remedies made available by the State can satisfy the Due Process Clause." *Id.* at 538, 101 S.Ct. at 1914. *See, also, McKesson Corp. v. Division of Alcoholic Beverages & Tobacco, Dep't of Business Regulation,* 496 U.S. 18, 40–41, 110 S.Ct. 2238, 2252–53, 110 L.Ed.2d 17 (1990); *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984) ("[f]or intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable post-deprivation remedy"); *Lindsey v. Storey,* 936 F.2d 554, 561 (11th Cir.1991) (no Due Process claim for seizure of property where "the state has provided an adequate post-deprivation remedy"); *Byrd v. Stewart,* 811 F.2d 554, 555 n. 1 (11th Cir.1987) (same); *Rymer v. Douglas County,* 764 F.2d 796, 803 (11th Cir.1985) (no Due Process claim "unless the state refused to provide a meaningful post-deprivation remedy").

▆▆▆ Uniforce's substantive Due Process claims are equally deficient. In order to pass constitutional muster, as plaintiffs acknowledge, these combination rules "need only be rationally related to a legitimate state interest." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).[13] This standard reflects the tenet that neither the equal protection clause nor the due process clause of the Fourteenth Amendment empowers the judiciary to sit as a super-legislature to weigh the wisdom of legislation. *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91, *reh'g denied,* 439 U.S. 884, 99 S.Ct. 232, 233, 58 L.Ed.2d 200 (1978).

"A person challenging the regulation of economic transactions must 'negative every conceivable basis which might support' the rule." *National Paint & Coatings Ass'n. v.*

**13.** The present discussion assumes, without deciding, the truth of Uniforce's assertion (Compl. ¶ 82) that defendants were "state actors" and that their alleged actions were performed under color of state law. Otherwise, of course, no

Constitutional issue would be presented, since the Fourteenth Amendment has no application to the actions of private parties. *Rendell–Baker v. Kohn,* 457 U.S. 830, 837–38, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982).

*City of Chicago,* 45 F.3d 1124, 1127 (7th Cir.1995), *quoting Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351, *reh'g denied,* 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 200, 201 (1973). Plaintiffs have not met that stringent standard here. The combination rules provide a means by which insurers can measure the loss experience of affiliated entities, as well as a procedure by which the states can restrict the ability of insureds to avoid premium obligations by constantly shifting corporate forms. (*See* Vieweg Aff. ¶ 7). As the combination rules constitute a rational component of the assigned risk system which the state regulators have a legitimate interest in operating, they are not constitutionally infirm. Count Three of plaintiffs' First Amended Complaint accordingly must be dismissed.

*Declaratory Judgment Claim*

■ Plaintiffs also seek a declaratory judgment regarding (1) whether the NCCI and the Pool are insurance carriers and (2) what state has overall responsibility for regulating and supervising the business of the NCCI and the Pool as it affects plaintiffs' businesses. (Pl.Mem. at 19).

In order for this Court to issue a declaratory judgment under 28 U.S.C. § 2001, it must first determine there to be a justiciable controversy within the meaning of Article III of the United States Constitution which must be "a real and substantial controversy admitting of specific relief through a decree of a conclusive character." *Hendrix v. Poonai,* 662 F.2d 719, 721 (11th Cir.1981), *quoting Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617, *reh'g denied,* 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889 (1937).

Neither question posed by plaintiffs presents such a real and substantial controversy. As discussed above, the application of the McCarran–Ferguson Act to plaintiffs' antitrust claims is not dependent on whether NCCI or the Pool are insurance companies. Plaintiffs fail to offer any other basis for their requested declaration on this point. Further, the clear structure imposed by Congress through the McCarran–Ferguson Act was to lodge regulatory power over the business of insurance in the insurance departments of the "several states," i.e., for each state to regulate conduct within its own borders. For these reasons, Count Four of the First Amended Complaint is dismissed.

As Counts One through Four are insufficient as a matter of law, the Court hereby dismisses Count Five of the First Amended Complaint as well, inasmuch as it does not set forth any new substantive claim but merely an additional prayer for relief.

### ORDER

IT IS THEREFORE ORDERED that (1) the motion for summary judgment filed by defendants is hereby GRANTED and (2) all claims asserted by plaintiffs in their First Amended Complaint are hereby DISMISSED with prejudice.

SO ORDERED.